**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RIVER VALLEY INGREDIENTS, LLC, TYSON POULTRY, INC., and TYSON FARMS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., AMPRO PRODUCTS, INC. n/k/a CROSSROADS PROPERTIES B, INC., GEORGIA FEED PRODUCTS COMPANY, L.L.C. n/k/a CROSSROADS PROPERTIES C, LLC, THOMAS N. ("TOMMY") BAGWELL, DON MABE, MARK HAM, and MIKE HULL, | ) ) ) ) ) ) ) ) ) ) | C.A. No. 19-2358-RGA  **PUBLIC VERSION** |
| Defendants. | ) | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
<u>HAM'S MOTION TO DISMISS</u>**

OF COUNSEL:

Edward S. Sledge IV
Whitt Steineker
Zachary A. Madonia
Hillary C. Campbell
K. Laney Gifford
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000
esledge@bradley.com
wsteineker@bradley.com
zmadonia@bradley.com
hcampbell@bradley.com
lgifford@bradley.com

April 1, 2020

Stephen B. Brauerman (#4952)
Sarah T. Andrade (#6157)
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
sandrade@bayardlaw.com

*Attorneys for Plaintiffs River Valley Ingredients, LLC, Tyson Poultry, Inc., and Tyson Farms, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................................... 1

STATEMENT OF RELEVANT FACTS ........................................................................................ 2

LEGAL STANDARD ..................................................................................................................... 5

ARGUMENT .................................................................................................................................. 6

I.        Ham's motion to dismiss is moot ....................................................................................... 6

II.       Ham is subject to personal jurisdiction and venue in Delaware. ....................................... 7

          A.        Ham is bound by the APA's forum selection clause. ............................................. 7

III.      Tyson plausibly alleges with the requisite particularity each element of its fraudulent
          inducement by misrepresentation claim ........................................................................... 11

          A.        Tyson alleges false representations of material fact. ............................................ 11

                    1.        Tyson alleges the "who, what, when, where, and how" of the fraud........ 11

                    2.        Tyson's Complaint does not use impermissible group pleading. ............. 12

          B.        Tyson properly alleges causation. ........................................................................ 14

          C.        Tyson alleges justifiable reliance. ........................................................................ 15

IV.       Tyson plausibly alleges a claim for civil conspiracy. ...................................................... 16

V.        Tyson plausibly alleges a claim for unjust enrichment. ................................................... 18

CONCLUSION ............................................................................................................................. 20

CERTIFICATE OF SERVICE ..................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*,
2005 WL 578972 (Del. Ch. Mar. 3, 2005)................................................................18

*Ausikaitis on behalf of Masimo Corp. v. Kiani*,
962 F. Supp. 2d 661, 673 (D. Del. 2013)..........................................................6, 19

*Aviation W. Charters, LLC v. Freer*,
2015 WL 5138285 (Del. Super. Ct. July 2, 2015) ................................................11

*Baker v. Impact Holding, Inc.*,
2010 WL 1931032 (Del. Ch. May 13, 2010) ..........................................................8

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005)....................................................................................6

*Brug v. Enstar Group, Inc.*,
755 F. Supp. 1247 (D. Del. 1991).........................................................................17

*Capital Grp. Cos., Inc. v. Armour*,
2004 WL 2521295 (Del. Ch. Oct. 29, 2004) ......................................................8, 9

*Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*,
779 F.3d 214 (3d Cir. 2015)................................................................................7, 9

*China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*,
788 F. Supp. 815 (D. Del. 1992)...........................................................................16

*Cty. of Nassau v. New York*,
724 F. Supp. 2d 295 (E.D.N.Y. 2010) ....................................................................6

*Donsco, Inc. v. Casper Corp.*,
587 F.2d 602 (3d Cir. 1978)..................................................................................16

*E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*,
744 A.2d 457 (Del. 1999) .....................................................................................11

*First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Baltimore, Inc.*,
2012 WL 1150131 (E.D. Pa. Apr. 5, 2012) ..........................................................10

*Fitzgerald v. Cantor*,
1998 WL 326686 (Del. Ch. June 16, 1998) ..........................................................20

*Foglia v. Renal Ventures Mgmt., LLC,*
  754 F.3d 153 (3d Cir. 2014)..................................................................................5

*Greenstar, LLC v. Heller,*
  814 F. Supp. 2d 444 (D. Del. 2011)....................................................................15

*Halpert v. Zhang,*
  966 F. Supp. 2d 406 (D. Del. 2013)....................................................................19

*HTC Corp. v. IPCom GmbH & Co., KG,*
  671 F. Supp. 2d 146 (D.D.C. 2009)....................................................................20

*Hupan v. Alliance One International, Inc.,*
  2015 WL 7776659 (Del. Super. Ct. Nov. 30, 2015)......................................13, 14

*James Julian, Inc. v. Raytheon Co.,*
  499 F. Supp. 949 (D. Del. 1980)........................................................................16

*Johnston v. Baker,*
  445 F.2d 424 (3d Cir. 1971)................................................................................18

*Kalmanovitz v. G. Heileman Brewing Company, Inc.,*
  595 F. Supp. 1385 (D. Del. 1984)......................................................................17

*MBIA Ins. Corp. v. Royal Indem. Co.,*
  221 F.R.D. 419 (D. Del. 2004) .....................................................................12, 13

*McDermott v. Clondalkin Grp., Inc.,*
  649 F. App'x 263 (3d Cir. 2016) .........................................................................19

*McWane, Inc. v. Lanier,*
  2015 WL 399582 (Del. Ch. Jan. 30, 2015)...........................................................8

*MIG Invs. LLC v. Aetrex Worldwide, Inc.,*
  852 F. Supp. 2d 493 (D. Del. 2012)................................................................17, 20

*Nemec v. Shrader,*
  991 A.2d 1120 (Del. 2010) .................................................................................18

*Neurvana Medical, LLC v. Balt USA, LLC,*
  2019 WL 4464268 (Del. Ch. Sept. 18, 2019) ......................................................11

*Ninespot, Inc. v. Jupai Holdings Ltd.,*
  2018 WL 3626325 (D. Del. July 30, 2018) .......................................................7, 8

*Oparaji v. Innovate 1 Servs., Inc.,*
  2018 WL 4922367 (D.N.J. Aug. 2, 2018) .............................................................6

*Rose v. Bartle*,
    871 F.2d 331 (3d Cir. 1989)..................................................................16

*Simon v. Castello*,
    172 F.R.D. 103 (S.D.N.Y. 1997) ..........................................................13

*Solis v. City of Fresno*,
    2012 WL 868681 (E.D. Cal. Mar. 13, 2012) ........................................20

*Stanley Black & Decker, Inc. v. Gulian*,
    70 F. Supp. 3d 719 (D. Del. 2014)........................................................18

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..................................................................................6

*Synthes, Inc. v. Emerge Med., Inc.*,
    887 F. Supp. 2d 598 (E.D. Pa. 2012) ....................................................10

*Toys "R" Us, Inc. v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003).............................................................6, 10

*Truinject Corp. v. Nestle Skin Health, S.A.*,
    2019 WL 6828984 (D. Del. Dec. 13, 2019)...........................................11

*Vichi v. Koninklijke Philips Elecs., N.V.*,
    85 A.3d 725 (Del. Ch. 2014).............................................................14, 15

*Weygandt v. Weco, LLC*,
    2009 WL 1351808 (Del. Ch. May 14, 2009).......................................8, 10

**Statutes**

Federal Food, Drug, and Cosmetic Act ..........................................................4

**Other Authorities**

Fed. R. Civ. P. 8(e) .......................................................................................20

Fed. R. Civ. P. 9(b) ...........................................................................6, 11, 12, 20

Fed. R. Civ. P. 12(b)(6).....................................................................................5

Plaintiffs (collectively, "Tyson") submit this answering brief in opposition to Mark Ham's motion to dismiss. (*See* D.I. 46.)

## PRELIMINARY STATEMENT

This case is not properly before this Court because Defendant Mabe filed a procedurally and substantively defective removal. (*See* D.I. 9, 13, 18.) The Court should grant Tyson's motion to remand and deny Ham's motion to dismiss as moot. If the Court addresses the motion to dismiss, it should be denied. The Complaint contains detailed allegations which, when accepted as true, establish that Ham (1) took specific, individual steps to fraudulently induce Tyson to purchase API's poultry-rendering facilities and operations at an inflated price; (2) conspired with the other API Executives[1] and the corporate entity defendants to accomplish this fraud; and (3) unjustly enriched himself through that wrongdoing and at Tyson's expense. Ham was a driving force in the plan to defraud Tyson. He directed and worked with API employees to rectify API's improper rendering practices before Tyson began on-the-ground due diligence. Despite knowing about and directing API's improper rendering practices and the efforts to conceal them, Ham approved the APA at an amount he knew was based on inflated financials and the fraud he engineered.

## SUMMARY OF ARGUMENT

The Court should deny Ham's motion to dismiss for several reasons:

1.      This case was improperly removed. As such, the Court should remand this action to the Delaware Superior Court and deny the motion to dismiss as moot.

2.      The forum selection clause binds Ham because it is valid; Ham is closely related to the APA; and the claims at issue arise from his standing relative to the APA. Bound by the forum selection clause, Ham is subject to personal jurisdiction and venue in Delaware.

---

[1] Bagwell, Mabe, Ham, and Hull are referred to collectively herein as the "API Executives."

3.     Tyson plausibly alleges with the requisite particularity each element of its fraudulent inducement by misrepresentation claim. The Complaint alleges the "who, what, when, where, and how" of the fraud, does not engage in impermissible group pleading, and alleges causation and reliance.

4.     Tyson alleges specific facts to support a viable claim for civil conspiracy, and the intracorporate conspiracy doctrine does not apply.

5.     Tyson pleads an adequate claim for unjust enrichment because River Valley Ingredients ("RVI") and Tyson Farms sufficiently plead their loss and a relationship between that loss and Ham's enrichment, and the APA does not bar the claim.

## STATEMENT OF RELEVANT FACTS

As part of API's leadership, Ham was integral to carrying out the fraud against Tyson. (D.I. 5-2 ¶¶ 17, 21(c).) Ham was American Proteins' CEO (*id.*) and President and a member of American Proteins' and AMPRO's boards of directors at the time of the acquisition forming the basis of this action (AMPRO Written Consent, attached as Exhibit A.).[2] As American Proteins' CEO, Ham was personally and substantially involved in negotiating the APA. (D.I. 5-2 ¶ 21(c).)

Ham and the other API Executives consented to and directed the use of SPN to manufacture poultry by-product meal at API's Cumming and Hanceville poultry rendering facilities. (*Id.* ¶¶ 45–49.) For instance, on multiple occasions, API Employee No. 2 discussed his concerns over using SPN in poultry by-product meal with Ham after Ham became American Proteins' CEO. (*Id.* ¶ 54.) During these conversations, Ham confirmed he had spoken with Bagwell (API's majority shareholder and chairman of American Proteins' and AMPRO's boards) about the issue. (*Id.*)

---

[2] The AMPRO Written Consent is incorporated by reference into the Complaint. (*Infra* at § V, n.12.) The Complaint attaches the APA, and the APA identifies the Written Consent as a document to be delivered at closing. (*See* D.I. 5-2, Ex A. at § 3.2(a)(v)(D).) The Court may also consider it in deciding Ham's challenge to personal jurisdiction.

Additionally, during a lunch meeting in late 2016 or early 2017, API Employee No. 2 and Ham discussed the fact that API Employee No. 2 had raised concerns over SPN use as early as July 2012, and Ham conceded that he did not like the practice of using SPN in poultry by-product meal. (*Id.*) Yet, Ham and the other API Executives drove API's improper rendering practices, recognizing these practices gave API a competitive advantage and concluding the benefits of including SPN in poultry by-product meal were too great at Hanceville and Cumming to implement a process change. (*Id.* ¶¶ 45–48.)

This all changed once Tyson entered into discussions to explore a sale of certain of API's assets and operations. (*Id.* ¶¶ 57–58.) After Tyson communicated its interest in purchasing these assets and operations, including API's poultry rendering facilities (and related intangible assets), Ham and the other API Executives feverishly facilitated a scheme to eradicate SPN from poultry by-product meal and to conceal from Tyson API's decades of wrongdoing. (*Id.* ¶ 58.) Ham told API Employee No. 3 that he would like SPN removed from the poultry by-product meal manufacturing processes by the end of 2017 because using SPN in poultry by-product meal could "cost [Bagwell] his company." (*Id.* ¶ 63.) Ham initiated discussions among API's leadership confirming that customer contracts dating back to 1994 and relevant law prohibited API's rendering practices. (*Id.* ¶ 66.) Ham steered the efforts to end API's improper rendering practices before Tyson visited API's facilities, (*id.* ¶¶ 63–64, 68–69, 71, 76–78), and conspired with the other Defendants to conceal those practices and their impact on API's financials. (*Id.* ¶¶ 143–47.)

In a late 2017 meeting, Ham directed API employees to quickly get SPN out of the production processes for poultry by-product meal. (*Id.* ¶ 64.) On November 6, 2017, Ham emailed API Employees Nos. 1, 5, and 4 and described fiscal year 2017 as a year to "get many projects approved and started (many completed) that have been 'swept under the carpet' for some time,"

including the SPN removal project. (*Id.* ¶ 68.) Ham, along with Bagwell and Hull, pressured API employees, including API Employees Nos. 1–5, to complete SPN removal as quickly as possible via regular meetings, communications, and oversight in the removal project. (*Id.* ¶¶ 58, 68–69, 71, 72, 74.) Ham authorized at least $152,000 in bonuses to employees integral in accomplishing SPN removal before Tyson's on-the-ground due diligence. (*Id.* ¶¶ 76–77.)

Following SPN removal, Ham and the other API Executives knew it was important to keep Defendants' past transgressions secret. Ham and the other API Executives had approximately 48 API employees, including those integral in the SPN removal, execute five-year term nondisclosure agreements in exchange for large monetary bonuses. (*See, e.g.*, *id.* ¶¶ 103–14 ($274,000 to API Employee No. 1, $204,000 to API Employee No. 3, and $250,000 to API Employee No. 5).) Ham also demanded that his emails be excluded from the assets acquired under the APA. (*Id.* ¶ 113.)

The decades-long improper rendering processes inflated API's financial performance. (*Id.* ¶¶ 120–21.) Defendants represented to Tyson, however, that that the financial records provided to Tyson were complete and correct, even though Defendants knew those records were false and misleading. (*Id.*) The APA contained a litany of fraudulent representations and warranties that:

- since January 1, 2013, API had not conducted its business "in material violation of any Applicable Law or Permit;"
- all of API's products conformed to "all applicable contractual commitments;"
- in all material respects, API had complied with "Applicable Law" with respect to the labeling and description of all products sold, manufactured, or distributed;
- since January 1, 2015, all of API's products complied with the provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA");
- API had complied with all applicable regulations and requirements adopted by the Food and Drug Administration ("FDA"), including labeling and product composition requirements;
- API's books of account and other financial records were complete and correct; and
- API's products were not "adulterated" or "misbranded." (*Id.* ¶¶ 116–29.)

In addition, API had not complied with the energy cost reconciliation processes that API's

raw materials contracts required. (*Id.* ¶¶ 82–86.) This compounded the inflation of API's financial performance and the false and misleading nature of the financial statements provided to Tyson and directly incorporated into the APA. (*Id.*) The API Executives were involved in this scheme as well, ensuring it was not uncovered to Bagwell's detriment. For instance, Ham directed API Employee No. 3 to keep money in Bagwell's pocket when that employee asked Ham about the need to reconcile the monthly energy cost reconciliation process. (*Id.* ¶ 84.)

Lastly, Defendants represented in the APA that they had provided "all environmental assessments, audits, investigations, reports or the like that were created or prepared within the last five (5) years." (*Id.* ¶ 89.) But Defendants concealed an April 2017 environmental report (the "Reid Report") that documented the need for millions of dollars in improvements at the Hanceville, Alabama rendering facility. (*Id.* ¶¶ 87–90.)

Ham knew these representations were being made, knew they were false, and, yet, still allowed them to be made, intending for Tyson to rely upon them. Ham was personally and substantially involved in negotiating the APA and assented to the APA as a member of American Proteins' (*id.* ¶ 17) and AMPRO's boards of directors (Ex. A, AMPRO Written Consent.). Through this campaign of deception engineered and implemented by Ham and the other API Executives, Defendants induced Tyson to pay API the inflated sum of over $825 million for the assets at issue. (*Id.* ¶ 133.) Ham received significant, direct benefits as a result, in the form of a bonus designed to incentivize Ham, Hull, and various API employees to induce Tyson into entering the APA at an inflated price. (*Id.* ¶¶ 98–115, Ex. A at Schedule 4.17.)

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded factual allegations as true and must draw "all reasonable inferences … in the light most favorable to the nonmovant." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014).

"The court's determination is not whether the non-moving party will ultimately prevail but whether that party is entitled to offer evidence to support the claims." *Ausikaitis on behalf of Masimo Corp. v. Kiani*, 962 F. Supp. 2d 661, 673 (D. Del. 2013) (internal quotations omitted). Federal Rule of Civil Procedure 9(b) applies to Tyson's fraud claims and requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Finally, "in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).

## **ARGUMENT**

### I.     **Ham's motion to dismiss is moot.**

The Court's ability to exercise jurisdiction over a matter is "a threshold question that must be resolved … before proceeding to the merits." *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). Thus, where a party files a motion to remand, the court should first determine whether removal was proper before addressing merits arguments raised in other pending motions. *See, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005) ("Because a holding that the district court lacked removal jurisdiction would end our inquiry, we first address the district court's denial of [the] motion to remand the case to state court for lack of jurisdiction."); *Cty. of Nassau v. New York*, 724 F. Supp. 2d 295, 300 (E.D.N.Y. 2010) (same); *see also Oparaji v. Innovate 1 Servs., Inc.*, 2018 WL 4922367, at *2 (D.N.J. Aug. 2, 2018) (considering motion to remand for a procedural defect before addressing motion to transfer).

In its motion to remand, Tyson details the procedural and substantive defects of the removal, which warrant remand of this matter. (*See* D.I. 13 at 5–13; D.I. 18 at 2–10.) Only if the

Court finds that removal was proper may the Court take up the motion to dismiss, which the Court should deny for the reasons set forth below.

## II.      Ham is subject to personal jurisdiction and venue in Delaware.

Ham is subject to personal jurisdiction and venue in Delaware under the APA. The APA's forum selection clause states that each party "submits itself and its property in any action or Proceeding to the exclusive general jurisdiction of the courts of the State of Delaware or, if unavailable, the federal court in the State of Delaware" and "waives any objection that it may … have to the venue of any such action or Proceeding in any such court …." (D.I. 5-2, Ex. A at § 11.5.) Because the APA's forum selection clause requires claims related to the APA to be litigated in Delaware, "the main issue is whether [Ham] is bound by the Delaware forum selection clause." *Ninespot, Inc. v. Jupai Holdings Ltd.*, 2018 WL 3626325, at *4 (D. Del. July 30, 2018). "When a party is bound by a forum selection clause, the party consents to personal jurisdiction." *Id.* (citing *Hadley v. Shaffer*, 2003 WL 21960406, at *3 (D. Del. Aug. 12, 2003)). Because Ham is bound by the APA's forum selection clause, Delaware courts may exercise personal jurisdiction over him, and he has waived the right to object to venue.

### A.      Ham is bound by the APA's forum selection clause.

Ham is bound by the APA's forum selection clause because he is closely related to the APA, and Tyson's claims against him arise out of his standing with respect to the APA. A party may be bound by a forum selection clause, even if the party did not sign the agreement containing the clause, when (1) "the forum selection clause is valid," (2) the non-signatory is either "a third-party beneficiary of the agreement or closely related to the agreement," and (3) "the claim at hand arise[s] from the non-signatory's status related to the agreement[.]" *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 218 (3d Cir. 2015); *see also, e.g.*, *Ninespot, Inc.* 2018 WL3626325, at *4. "If each of the answers to the three-part test is affirmative," as is the case here,

"then the party is bound by the forum selection clause." *Ninespot, Inc.*, 2018 WL 3626325, at *4. In applying this test, Delaware state and federal courts routinely hold non-signatories to an agreement bound by Delaware forum selection clauses. *See, e.g.*, *Ninespot, Inc.*, 2018 WL 3626325, at *4–5 (finding non-signatory bound to Delaware forum selection clause and subject to personal jurisdiction); *McWane, Inc. v. Lanier*, 2015 WL 399582, at *7 (Del. Ch. Jan. 30, 2015) (same).[3] This Court should follow suit for the following reasons.

**First**, "[f]orum selection clauses are presumptively valid and have been regularly enforced" in Delaware. *Capital Grp. Cos., Inc.*, 2004 WL 2521295, at *6. Ham has offered no basis to refute the presumed validity of the forum selection clause.

**Second**, Ham is closely related to the APA. A non-signatory is considered closely related to an agreement where he or she receives a direct benefit from the agreement or if it was foreseeable that the non-signatory would be bound by the agreement. *See Baker*, 2010 WL 1931032, at *4; *Capital Grp. Cos., Inc.*, 2004 WL 2521295, at *5. Ham satisfies both the "direct benefit" and "foreseeability" prong of the closely related test. As shown in Schedule 4.17 to the APA, Ham received a bonus as a result of the APA. (D.I. 5-2, Ex. A at Schedule 4.17.) That constitutes a direct benefit from the APA. *See Ninespot, Inc.*, 2018 WL 3626325, at *6; *McWane, Inc.*, 2015 WL 399582, at *7 (finding non-signatories received a direct benefit from the agreement at issue via money received from the sale of their stock and a contingent interest in a portion of an escrow account).[4]

---

[3] *See also, e.g.*, *Baker v. Impact Holding, Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010) (finding non-signatory bound by forum selection clause under the closely related test); *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *4–6 (Del. Ch. May 14, 2009) (exercising personal jurisdiction over non-signatory under the closely related test); *Capital Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *5–7 (Del. Ch. Oct. 29, 2004) (same).

[4] Under Delaware law, a direct benefit need not be expressly provided in the terms of the relevant agreement. *See, e.g.*, *Ninespot, Inc.*, 2018 WL 3626325, at *6 (finding found that a non-signatory

It was also foreseeable that Ham would be bound by the forum selection clause. Tyson alleges an extensive pattern of fraudulent conduct by Ham with respect to the negotiations related to, and the due diligence period leading up to, the transaction with Tyson, including the fact that Ham initiated discussions among API's leadership confirming customer contracts dating back to 1994 and relevant law prohibited API's rendering practices. Ham drove API's improper rendering practices, drove the effort to end those practices before Tyson's due diligence period, and then led the effort to conceal those practices and their impact on the financials Tyson relied upon. Further, Ham was personally and substantially involved in negotiating the APA and assented to the APA as a member of American Proteins' and AMPRO's boards of directors. Given Ham's participation in the conduct aimed at fraudulently inducing Tyson to enter the APA at an inflated price and his approval of the APA, it was foreseeable he would be bound by the forum selection clause.[5]

The facts here—a decades long scheme that culminated in defrauding Tyson to overpay for the operations that were the subject of the APA—particularly warrant the enforcement of the forum selection clause against Ham. Ham acted as American Proteins' President and CEO and a member of American Proteins' and AMPRO's boards of directors. Ham participated in the fraud and reviewed and approved the APA, which was knowingly predicated on inflated financials and other misrepresentations. *See Carlyle Inv. Mgmt., LLC*, 779 F.3d at 219 ("This result is consistent with Delaware cases in which affiliates, officers, and directors have been held to be bound by

---

"stood to receive the direct benefit of shares in Plaintiff from the completion of the Stock Purchase Agreement" even though the non-signatory "was not set to receive Plaintiff's shares directly from Plaintiff" under the terms of the agreement); *Capital Grp. Cos., Inc.*, 2004 WL 2521295, at *7 (holding non-signatory received a direct benefit from a stock restriction agreement even though the non-signatory was not a party to the agreement and nothing in the agreement's terms provided a benefit to the non-signatory).

[5] Ham asserts in a footnote in his brief that process served on him was insufficient, (*see* D.I. 46 at 5 n.4), but that is a red herring. Defendants' counsel acknowledged service of process for *all Defendants*—including Ham—and notified the Court of this acknowledgement. (D.I. 6.)

forum selection clauses."). Courts in the Third Circuit have repeatedly bound non-signatories to forum selection clauses in similar circumstances. *See, e.g.*, *Synthes, Inc. v. Emerge Med., Inc.*, 887 F. Supp. 2d 598, 611–12 (E.D. Pa. 2012) (holding non-signatory bound by a forum selection clause contained in a non-compete signed by individuals with whom the non-signatory conspired to create and run a company that violated the non-compete); *First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Baltimore, Inc.*, 2012 WL 1150131, at *3 (E.D. Pa. Apr. 5, 2012) (recognizing "when signatories and non-signatories act together against the interests of the plaintiff, the non-signatory co-conspirators may also be bound by the forum selection clause").

**Finally**, the claims asserted against Ham arise out of his standing with respect to the APA. Tyson alleges that Ham was fully aware of API's improper rendering practices and led the campaign to end those practices before Tyson's due diligence period. Ham was personally and substantially involved in negotiating the APA and assented to the APA as a member American Proteins' and AMPRO's boards of directors, knowing that the purchase price was based upon inflated, historical financial results achieved by improper rendering practices and the APA contained numerous warranty misrepresentations. Tyson seeks to recover the amount by which Ham was unjustly enriched after API transferred to him portions of the cash proceeds fraudulently obtained under the APA. (*See* D.I. 5-2 at Count III.) Tyson would not have any claims against Ham but for the APA and his relationship to it. *See Weygandt*, 2009 WL 1351808, at *4 n.15 (recognizing that the meaning of the third prong is that the claims asserted arise from the agreement at issue). Because each of the requirements of the test is satisfied,[6] Ham is bound by the APA's

---

[6] Alternatively, if the Court has any doubts about whether it has personal jurisdiction over Ham, Tyson should be allowed to conduct jurisdictional discovery to prove that Ham is subject to jurisdiction and venue in Delaware. "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous." *Toys "R" Us, Inc.*, 318 F.3d at 456.

forum selection clause and is subject to personal jurisdiction and venue in this Court.[7]

### III.   Tyson plausibly alleges with the requisite particularity each element of its fraudulent inducement by misrepresentation claim.

The elements of fraudulent inducement by misrepresentation are: (1) a false representation of material fact; (2) knowledge that the representation was false or deliberate indifference to whether the representation was false; (3) intent to induce the plaintiff to act; (4) that the plaintiff acted in justifiable reliance on the false representation; and (5) that the plaintiff suffered damages as a result of the reliance. *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999). Tyson sufficiently pleads each of these elements with the requisite particularity.

#### A.   Tyson alleges false representations of material fact.

##### 1.   Tyson alleges the "who, what, when, where, and how" of the fraud.

Ham baldly contends that Tyson did not allege with particularity the elements of its fraud claim. (*See* D.I. 46 at 5–8.) But the Complaint easily satisfies the Rule 9(b) standard.

As mentioned above, Tyson alleges an extensive pattern of fraudulent conduct by Ham (the

---

[7] The cases Ham relies on to incorrectly contend that Delaware courts do not allow a plaintiff to invoke a forum selection clause against a non-signatory under the closely related test are distinguishable. In *Truinject Corp. v. Nestle Skin Health, S.A.*, 2019 WL 6828984, at *12 (D. Del. Dec. 13, 2019), the plaintiff alleged the non-signatory received a direct benefit because the non-signatory's CFO simply reviewed confidential information under a confidential disclosure agreement related to a potential business deal between the non-signatory's subsidiary and the plaintiff. The court found it was doubtful being privy to this information was a benefit in the first instance, and in any event, that such a benefit was indirect because there was no evidence the non-signatory discussed entering a business deal with the plaintiff. *Id.* In *Neurvana Medical, LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019), the plaintiff "allege[d] no facts indicating that [the non-signatory] received any sort of benefit from the Purchase Agreement." Finally, in *Aviation W. Charters, LLC v. Freer*, 2015 WL 5138285, at *4 (Del. Super. Ct. July 2, 2015), the plaintiff admitted at oral argument that the plaintiff had no facts to show the non-signatory received a direct benefit from the agreement. Here, Tyson alleges Ham received a direct monetary benefit from the APA.

*by whom*) with respect to the negotiations related to, and the due diligence period leading up to the transaction (the *when* and *where*) with Tyson (the *to whom*). Ham acted as American Proteins' President and CEO and a member of American Proteins' and AMPRO's boards of directors. He participated in the fraud and reviewed and approved the APA. Ham initiated discussions among API's leadership confirming customer contracts and relevant law prohibited API's rendering practices, and Ham and API's leadership decided to continue those practices until right before Tyson's due diligence period. Ham conspired with the other API Executives and API to conceal those practices and their impact on the financials Tyson relied upon (the *what* and *how*). Further, Ham was substantially involved in negotiating the APA and assented to the APA as a member of American Proteins' and AMPRO's boards of directors. And the Complaint alleges the *why* of the fraud: to induce Tyson into purchasing API's rendering operations at an inflated price. Rule 9(b) requires nothing more.

### 2.    Tyson's Complaint does not use impermissible group pleading.

Contrary to Ham's assertion (D.I. 46 at 8–10) there is "no *per se* rule" under Rule 9(b) against the use of collective labels to describe defendants. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004). Instead, impermissible group pleading only occurs when a complaint lumps multiple defendants together without alleging what each specific defendant did wrong. *Id.* (explaining impermissible group pleading fails to provide defendants with "adequate notice of the charges against [them]," thereby precluding them from "mount[ing] a defense"). By contrast, the Complaint here alleges precisely what Ham did wrong:

- Ham knew about API's use of SPN when he took over as American Proteins' CEO and knew that API Employee No. 2 raised concerns over using SPN as early as 2012. (D.I. 5-2 ¶ 54.) In a September 2017 email to API's leadership, Ham confirmed what he and the others already knew: customer contracts dating back to 1994 and applicable law prohibited SPN in poultry by-product meal. (*Id.* ¶ 66.)

- After, Ham directed API employees to quickly get SPN out of the production processes for poultry by-product meal. (*Id.* ¶ 64.) Ham indicated to API Employee No. 3 that he would like SPN removed from the poultry by-product meal manufacturing processes by the end of 2017 because using SPN in poultry by-product meal could "cost [Bagwell] his company." (*Id.* ¶ 63.)

- In a November 6, 2017 email, Ham described 2017 as a year to "get many projects approved and started (many completed) that have been 'swept under the carpet' for some time," including the SPN removal project. (*Id.* ¶ 68.)

- Ham, along with Bagwell and Hull, pressured API employees to complete SPN removal as quickly as possible via regular meetings, communications, and oversight in the removal project. (*Id.* ¶¶ 58, 68, 72, 74.)

- Ham authorized at least $152,000 in bonuses to employees integral in accomplishing SPN removal before Tyson's on-the-ground due diligence. (*Id.* ¶¶ 76–77.)

- Ham hid these transgressions by having API employees sign nondisclosure agreements and by excluding his emails from the assets acquired under the APA. (*Id.* ¶ 103–14.)

Knowing these facts, Ham assented to the APA and its fraudulent misrepresentations with the intent of inducing Tyson into paying an inflated price for API's rendering operations. The Complaint specifically alleges what Ham said and did, when, and where. There is no impermissible group pleading. *See MBIA Ins. Corp.*, 221 F.R.D. at 421.

The cases Ham cites are inapposite. In *Simon v. Castello*, 172 F.R.D. 103, 106 (S.D.N.Y. 1997), the plaintiff attempted to hold two corporate officers and directors personally responsible for the misrepresentations of the corporation, without any particularized allegations that the two defendants played any role in the purported fraud. *See id*. In contrast, Tyson alleges Ham's direct, particularized involvement in the fraud. (*See supra* at III(A)(2).)

Likewise, in *Hupan v. Alliance One International, Inc.*, 2015 WL 7776659, at *2 (Del. Super. Ct. Nov. 30, 2015), the plaintiff named two Monsanto entities as defendants to a product liability claim and collectively labeled the defendants as "Monsanto." The court dismissed one entity for lack of personal jurisdiction and the other for plaintiff's failure to allege the product it

13

produced (*i.e.*, specific wrongdoing) in a product liability case. *Id.* at *11–12. *Hupan* has no bearing here because the Complaint specifically alleges facts setting out Ham's wrongdoing.

Finally, the Complaint properly refers to Tyson Poultry, Tyson Farms, and RVI collectively as "Tyson." (*See* D.I. 46 at 8.) Each Tyson entity has standing to pursue a fraud claim against Defendants: Tyson Poultry as the signatory of the APA; Tyson Farms and RVI as assignees of certain rights from Tyson Poultry, and which themselves also justifiably relied upon the APA's misrepresentations to their detriment. (*See infra* at V.)

## B.   Tyson properly alleges causation.

Ham contends that Tyson failed to sufficiently plead "proximate" causation, *i.e.*, that Ham's misrepresentations were the legal cause of Tyson's harm.[8] Ham is wrong. The Complaint plainly alleges that Defendants' fraudulent misrepresentations proximately caused Tyson's harm. The Complaint alleges that Tyson valued API's rendering business based on API's historical profitability as reflected in API's financial statements. (D.I. 5-2 ¶¶ 94–95, 133.) API's financial statements were not "complete and accurate," as Defendants fraudulently warranted, but were instead misleading, because they failed to explain that API's historical profitability was based, in substantial part, on API's history of impermissible rendering practices and failure to comply with energy cost formulas in its raw material contracts. (*Id.* ¶¶ 119, 121, 133.) The Complaint further alleges that Defendants misrepresented they had provided Tyson all engineering reports on which Tyson valued API's rendering assets, but knowingly concealed the undisclosed problems in the

---

[8] Ham refers to proximate causation as "loss causation," in an attempt to graft federal securities fraud elements onto Tyson's Delaware fraud claim. But the federal securities fraud element of loss causation—wherein a plaintiff must allege and show that the revelation of the truth caused the stock price to decline—has no bearing on Tyson's fraud claim, arising from an asset purchase. Nor, as Ham's own authority makes clear, is "loss causation" otherwise different from proximate causation under Delaware law. *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 816 (Del. Ch. 2014) (explaining that "loss causation" refers to proximate causation for fraud claims arising from the non-disclosure of an unmaterialized risk).

Reid Report that, combined with the other misrepresentations, resulted in Tyson's overpayment. (*Id.* ¶ 133.) In *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 452 (D. Del. 2011), this Court denied a motion to dismiss on proximate causation grounds where the plaintiffs alleged if they "had been apprised of the" fraudulently concealed information, they "would have been able to negotiate a [lower] sales price" for defendants' business. *Id. Greenstar* is directly on point.

*Vichi* does not hold otherwise. *Vichi*, decided after a five-day *trial*, does not speak to the *pleading standard* for proximate causation. 85 A.3d at 754. *Vichi* is also factually inapposite. Unlike here, in *Vichi*, the plaintiff lender failed to connect the defendant's fraud (the failure to disclose that a joint venture was part of a price-fixing cartel) to the plaintiff's injury (that joint venture's failure to repay a loan because of bankruptcy). The joint venture's cartel involvement was unrelated to its bankruptcy—and thus unrelated to the plaintiff's loss. *Id.* at 808–09. By contrast, Defendants' misrepresentations directly caused Tyson to overpay for API's rendering business. Tyson has clearly satisfied the element of causation; nothing more is required.

### C.      Tyson alleges justifiable reliance.

Ham does not dispute that Tyson adequately alleges justifiable reliance as to Tyson Poultry. (*See* D.I. 46 at 11–15.) Instead, Ham raises two meritless challenges to the Complaint's reliance allegations. First, Ham argues that Tyson is prohibited from bringing claims based on alleged extra-contractual conduct or omissions under Sections 5.7 and 11.7 of the APA. (*See id.* at 14.) This is a red herring. Tyson's claims are based on the false representations in the APA.

Second, Ham argues that as a non-signatory, Tyson could not have relied on any statements made by him when being induced to enter into the APA. This is wrong. As American Proteins' President and CEO, Ham was substantially involved in negotiating the APA, and he assented to the APA as a member of American Proteins' and AMPRO's boards of directors. Ham also played a role in the fraudulent misrepresentations contained within the APA and its execution at an

15

inflated price. *See, e.g.*, *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) (It is well-settled law that "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort."). Tyson justifiably relied on these fraudulent misrepresentations, and sufficiently pleaded this element. The Court should deny Ham's motion to dismiss.

## IV.   Tyson plausibly alleges a claim for civil conspiracy.

Ham contends that Tyson's civil conspiracy claim fails because (1) Tyson's fraud claim allegedly fails, (2) Tyson's conspiracy claim is not sufficiently particularized, and (3) the intracorporate conspiracy doctrine bars the claim. None of these contentions have merit.

First, Tyson sufficiently pled a claim for fraud. (*See supra* at III.)

Second, Tyson sufficiently pled its civil conspiracy allegations. The elements of civil conspiracy are "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*, 788 F. Supp. 815, 820 (D. Del. 1992); *see also James Julian, Inc. v. Raytheon Co.*, 499 F. Supp. 949, 955 (D. Del. 1980) (complaint should set forth "the parties to the alleged conspiracy, the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose.").[9]

Tyson alleges that "Defendants conspired with one another and aided and abetted each other in planning and perpetrating" the fraud against Tyson set forth in the Complaint. After Tyson Farms, American Proteins, and AMPRO signed the November 2017 letter of intent, Bagwell, Ham, and Hull met with various API employees to discuss the urgency of bringing API's improper

---

[9] "[A] court may look to any factual allegations of particular acts *within the complaint as a whole* incorporated by the conspiracy claim" to determine whether the complaint asserts a sufficient factual basis for a conspiracy claim. *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (internal citation omitted) (emphasis added).

rendering practices into compliance with the law and customer contracts before Tyson's due diligence period. Around this same time, Ham acknowledged the impropriety of API's rendering practices—and thus Defendants' need to cover them up—in an email to Bagwell, Hull, Mabe, and others. Thereafter, Bagwell, Ham, and Hull worked with API to end the improper rendering practices. These allegations show the period of the conspiracy: from the November 2017 letter of intent to the APA closing on August 20, 2018.

Tyson also alleges the objective of the conspiracy was to fraudulently induce Tyson to enter the APA for an inflated price. Tyson alleges specific acts Ham took in furtherance of the conspiracy. To conceal API's improper rendering practices from Tyson, Ham tasked certain API employees with cleaning up those rendering practices, and the employees received bonuses for doing so. Ham also consented to the APA's terms, despite being fully aware of and driving the efforts undertaken to conceal API's improper rendering practices from Tyson. Tyson also alleges damages resulting from the conspiracy. Accordingly, Tyson alleges sufficient facts to support its civil conspiracy claim against Ham. *See MIG Invs. LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493, 513 (D. Del. 2012) (denying motion to dismiss conspiracy claim where the complaint alleged the defendants worked together to defraud the plaintiff, alleged actions in furtherance of the conspiracy, and alleged damages as a result).[10]

Finally, the intracorporate conspiracy doctrine only applies where a corporation is alleged

---

[10] The cases Ham relies on are distinguishable. In *Brug v. Enstar Group, Inc.*, the plaintiff failed to allege how the defendants conspired together and did "not allege any meetings, any communications, or any other means for effecting the alleged conspiracy." 755 F. Supp. 1247, 1255 (D. Del. 1991). In *Kalmanovitz v. G. Heileman Brewing Company, Inc.*, the plaintiff asserted that the incorporated paragraphs of the complaint "'g[a]ve rise to an inference of conspiracy.'" 595 F. Supp. 1385, 1401 (D. Del. 1984). Here, Tyson does not merely rely on facts giving rise to an *inference* of conspiracy, but rather, Tyson sets forth *specific facts* to show every requirement for pleading a conspiracy claim is met, including the existence of meetings, communications, and money payments.

"to have conspired with its officers and agents." *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005). The doctrine does not bar a conspiracy claim where "at least one of the parties to the conspiracy was not an employee or agent of the corporation." *Johnston v. Baker*, 445 F.2d 424, 427 (3d Cir. 1971). The doctrine also does not bar a conspiracy between a corporation and its *own* officers "when the officer or agent of the corporation steps out of h[is] role as an officer or agent and acts pursuant to personal motives." *Amaysing Techs. Corp.*, 2005 WL 578972, at *7.[11] This issue is more appropriately decided by the trier of fact, not through a motion to dismiss.

Here, Tyson alleges a conspiracy between *separate* corporations and officers of *other* corporations. The API entities are separate corporate entities, and each API Executive was an employee or agent of only certain of the API entities. These independent entities and individuals conspired together to defraud Tyson into paying an inflated price under the APA. And Ham stood to receive a large payout if his efforts to defraud Tyson succeeded. The Complaint establishes the intracorporate conspiracy doctrine does not bar Tyson's claim.

## V.    Tyson plausibly alleges a claim for unjust enrichment.

Ham contends Tyson failed to allege the absence of a remedy at law or that RVI and Tyson Farms paid API anything under the APA, and that the existence of the APA precludes an unjust enrichment claim. As explained below, each of these arguments fails.

First, Tyson pleads an adequate unjust enrichment claim. "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d

---

[11] "Ordinarily, it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment." *Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 737 (D. Del. 2014) (internal citation omitted).

1120, 1130 (Del. 2010). Tyson alleges that, as a result of Ham's fraudulent conduct, API transferred substantial money and property to Ham at Tyson's expense and that Ham has no lawful justification for his enrichment at Tyson's expense. Further, Ham does not concede that he is bound by the APA. (D.I. 46 at 5.) And at this early stage of the proceedings, the Court "cannot conclude … that [Tyson's fraud and conspiracy] claims provide an adequate remedy at law to bar [Tyson] from also asserting unjust enrichment." *Ausikaitis*, 962 F. Supp. 2d at 680 (denying motion to dismiss unjust enrichment claim). Dismissal on this basis would be premature.

Second, RVI and Tyson Farms sufficiently plead their impoverishment and a relation between that impoverishment and Ham's enrichment. Ham's fraudulent conduct resulted in API transferring money and property to him at RVI's and Tyson Farms' expense because Tyson Poultry assigned its rights to purchase certain assets under the APA to both RVI and Tyson Farms the day before the APA transactions closed. (D.I. 5-2 ¶ 11; Assignments, attached as Exhibit B.)[12]

In addition, RVI and Tyson Farms properly allege certain facts related to money Ham received from his fraudulent conduct "upon information and belief." Pleading upon information and belief is permissible where "the requisite factual information is peculiarly within the defendant's knowledge or control" and the plaintiffs accompany "their legal theory with factual allegations that make their theoretically viable claim plausible." *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267–68 (3d Cir. 2016) (citations omitted). Ham received a bonus designed to incentivize Ham, Hull, and various API employees to induce Tyson into entering the APA at an inflated price. The facts regarding just how much Ham was unjustly enriched is within his control.

---

[12] When ruling on a motion to dismiss, "a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference." *Halpert v. Zhang*, 966 F. Supp. 2d 406, 412 (D. Del. 2013) (citations omitted). Tyson referenced the Tyson Farms assignment in the Complaint, (*see* D.I. 5-2 ¶ 11), and the APA recognized that Tyson Poultry could assign its rights under the APA to its affiliates (*see id.*, Ex. A at § 11.4.).

RVI and Tyson Farms should be allowed to discover that information, and until that time, may rely on supported allegations pleaded upon information and belief.[13]

Finally, the APA does not bar Tyson's unjust enrichment claim. Ham asserts that no written contract exists between him and Tyson and has not admitted he is bound by the APA. (D.I. 46 at 5.) Delaware law permits a claim for unjust enrichment where an express contract exists that does not "govern[] exclusively" the obligations of the parties at issue. *Fitzgerald v. Cantor*, 1998 WL 326686, at *6 (Del. Ch. June 16, 1998). Even if Ham admitted he is bound by the APA, "under Federal Rule of Civil Procedure 8(e), a plaintiff is permitted to plead counts in the alternative." *MIG Invs. LLC*, 852 F. Supp. 2d at 513. Tyson may plead unjust enrichment as an alternative theory of recovery for its fraud and breach of contract claims, and Ham's motion to dismiss the unjust enrichment claim should be denied.

## **CONCLUSION**

This action should be remanded to the Delaware Superior Court without consideration of Ham's meritless motion to dismiss, which the Court should deny as moot. If the Court considers the motion, it should deny it for the additional, independent reasons set forth above. If the Court concludes that any of Tyson's claims, as currently pleaded, are deficient, Tyson respectfully requests an opportunity to amend its Complaint to cure any such deficiency.

---

[13] Ham relies on inapplicable and distinguishable cases from other circuits discussing the heightened pleading standard under Rule 9(b) and pleading requirements for a "class of one" equal protection claim. *See HTC Corp. v. IPCom GmbH & Co., KG*, 671 F. Supp. 2d 146, 149 (D.D.C. 2009) (discussing pleading upon information and belief under Rule 9(b)); *Solis v. City of Fresno*, 2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012) (discussing whether allegations in second amended complaint were sufficient to state a claim under a "class of one" equal protection theory).

April 1, 2020                                          BAYARD, P.A.

                                                      /s/ Stephen B. Brauerman
OF COUNSEL:                                           Stephen B. Brauerman (#4952)
                                                      Sarah T. Andrade (#6157)
Edward S. Sledge IV                                   600 North King Street, Suite 400
Whitt Steineker                                       Wilmington, Delaware 19801
Zachary A. Madonia                                    (302) 655-5000
Hillary C. Campbell                                   sbrauerman@bayardlaw.com
K. Laney Gifford                                      sandrade@bayardlaw.com
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203                             *Attorneys for Plaintiffs River Valley*
(205) 521-8000                                        *Ingredients, LLC, Tyson Poultry, Inc.,*
esledge@bradley.com                                   *and Tyson Farms, Inc.*
wsteineker@bradley.com
zmadonia@bradley.com
hcampbell@bradley.com
lgifford@bradley.com

# EXHIBIT A

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

## PARTIAL ASSIGNMENT OF ASSET PURCHASE AGREEMENT

THIS PARTIAL ASSIGNMENT OF ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of August 19, 2018 (the "Effective Date"), by and between TYSON POULTRY, INC., a Delaware corporation ("Assignor"), and TYSON FARMS, INC., a North Carolina corporation ("Assignee").

A.        Assignor and AMPRO Products, Inc., American Proteins, Inc., and Georgia Feed Products Company, L.L.C. (collectively, "Sellers") are parties to the Asset Purchase Agreement dated May 14, 2018, as amended by First Amendment dated May 30, 2018, and Second Amendment dated effective June 20, 2018 (as amended, the "Purchase Agreement"). Capitalized terms used in this Agreement but not otherwise defined shall have the meaning given to such terms in the Purchase Agreement.

B.        Pursuant to the Purchase Agreement, Assignor will purchase the Transferred Assets from Sellers.

C.        Assignor now desires to transfer its right to purchase certain Transferred Assets to Assignee in accordance with Section 11.4 of the Purchase Agreement.

For good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows:

1.        Partial Assignment.  Assignor assigns all of its rights under the Purchase Agreement to purchase the Transferred Assets used in connection with the properties described on Exhibit A, including Sellers' interest in the Owned Facilities described on Exhibit A, and Assignee accepts and assumes such assignment.

2.        Further Assurances.  Each party shall execute and deliver such documents and perform, or cause to be performed, such acts as may be reasonably necessary to carry out the terms, conditions, and intent of this Assignment.

3.        Amendment.  This Assignment may be amended only by an instrument executed in writing by Assignor and Assignee.

4.        Binding Effect.  This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

5.        Counterparts.  This Assignment may be executed in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute one and the same instrument.  Counterparts may be delivered by facsimile or other electronic means and any executed counterpart delivered in such a manner shall be deemed an original.

[Signature Pages Follow]

22416518

Dated effective as of the date first state above.

ASSIGNOR:                                  TYSON POULTRY, INC., a Delaware corporation

By:_____

Name:_____

Title:_____

ASSIGNEE:                                TYSON FARMS, INC., a North Carolina corporation

By:_____

Name:_____

Title:_____

*Signature Page to Partial Assignment of Asset Purchase Agreement*

<u>EXHIBIT A</u>

<u>Owned Facilities</u>:

1170 County Road 508
Hanceville, Alabama 35077

82 Georgia Feed Drive
Cuthbert, Georgia 39840

419 US Highway 82 East
Cuthbert, Georgia 39840

819 County  Road 3328
Brundidge, Alabama 36010

1255 US Highway 1 South
Alma, Georgia 31510

22416518

## PARTIAL ASSIGNMENT OF ASSET PURCHASE AGREEMENT

THIS PARTIAL ASSIGNMENT OF ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of August 19, 2018 (the "Effective Date"), by and between TYSON POULTRY, INC., a Delaware corporation ("Assignor"), and TYSON BLENDING, LLC, a Delaware limited liability company ("Assignee").

A.     Assignor and AMPRO Products, Inc., American Proteins, Inc., and Georgia Feed Products Company, L.L.C. (collectively, "Sellers") are parties to the Asset Purchase Agreement dated May 14, 2018, as amended by First Amendment dated May 30, 2018, and Second Amendment dated effective June 20, 2018 (as amended, the "Purchase Agreement"). Capitalized terms used in this Agreement but not otherwise defined shall have the meaning given to such terms in the Purchase Agreement.

B.     Pursuant to the Purchase Agreement, Assignor will purchase the Transferred Assets from Sellers.

C.     Assignor now desires to transfer its right to purchase certain Transferred Assets to Assignee in accordance with Section 11.4 of the Purchase Agreement.

For good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows:

1.     Partial Assignment.  Assignor assigns all of its rights under the Purchase Agreement to purchase the Transferred Assets used in connection with the properties described on Exhibit A, including Sellers' interest in the Leased Facilities and Owned Facilities described on Exhibit A, and Assignee accepts and assumes such assignment.

2.     Further Assurances.  Each party shall execute and deliver such documents and perform, or cause to be performed, such acts as may be reasonably necessary to carry out the terms, conditions, and intent of this Assignment.

3.     Amendment.  This Assignment may be amended only by an instrument executed in writing by Assignor and Assignee.

4.     Binding Effect.  This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

5.     Counterparts.  This Assignment may be executed in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute one and the same instrument.  Counterparts may be delivered by facsimile or other electronic means and any executed counterpart delivered in such a manner shall be deemed an original.

[Signature Pages Follow]

22416511

Dated effective as of the date first state above.

ASSIGNOR:                              TYSON POULTRY, INC., a Delaware corporation

By:_____
Name:_____
Title:_____

ASSIGNEE:                              TYSON BLENDING, LLC, a Delaware limited
                                       liability company

By:_____
Name:_____
Title:_____

EXHIBIT A

Owned Facilities:

2305 O'Kelly Road
Gainesville, Georgia 30507

361 US Highway 82 East
Cuthbert, Georgia 39840

30 Cow Creek Road
Aliceville, Alabama 35442

102 Northeast 7th Street
Concordia, Missouri 64020

170 Ryan Road
Pickensville, Alabama 35447

4901 59th Avenue West
Muscatine, Iowa 52761

200 North Main Street
Ames, Nebraska 68621

Leased Facilities:

293 Pickens Port Road
Pickensville, Alabama 35447

1601 Marshall Avenue
Portsmouth, Virginia 23704

121 Northeast 80th Avenue
Stafford, Kansas 67578

221 US Highway 82 East
Cuthbert, Georgia 39840

6590 Bannister Road
Cumming, Georgia 30028

6683 Highway 136 West
Dawsonville, Georgia 30534

Railroad Siding
Gainesville, Georgia

22416511